Your Honor, it's this case on the docket. Sue Datchett, Anthony Datchett, 0909. Timber Creek Homes, Inc. Petitioner, Appellant. The Illinois Pollution Control Board, known as the Brown Lake Park Village Board, and the Freed Spirits Industries, Inc. Respondents' Appellees. Arguing on behalf of the District Appellant, Attorney Mr. Michael S. Glazer. Arguing on behalf of the Respondents' Appellees, Attorney Mr. Richard S. Porter, and Attorney Ms. Anne C. Mascaleras. Good morning. And Mr. Porter, you're going to take up 10 minutes, and Ms. Mascaleras, 5 minutes, correct? That's correct, Your Honor. All right, and then of course, Mr. Glazer, you'll have a rebuttal. Yes, Your Honor. Your Honor, if I may, we're also joined with the Village Attorney, Ms. Lynn Session, and the Village Board's Attorney, Peter Karlovich. They're available for questions, but we won't be arguing. All right, okay, good. Before we get started, I've been asked to remind the parties that there will be no trash-talking. I'm trying to get oral arguments. You don't get our humor? Okay. Okay, good. All right. It took a minute. I know it's early. It's early. That's okay. I'll be here all week. I thought you'd seen this in action before.  Mr. Glazer, you can begin. Thank you, Your Honor. Thank you. Welcome. Well, if you're familiar with Fox Marine, then you probably have seen this in action before. Good morning, Your Honors, and may it please the Court. We have a lot of ground to cover this morning in a very short period of time, so I'll just launch right in, and if there are any questions, obviously, I'll stop. We start first with the issue of fundamental fairness, and when you look at the case law in this area, and Justice Zinoff, you know it probably as well as anybody, given your involvement in two of the major cases in this area, it seems to be a question that's raised in every one of these cases, and I will tell you candidly, it's routinely raised improperly. Nine times out of ten, it's not the mega dump, for example. It's there was a financial motive, so there must have been predetermination, and that's clearly not enough. But your argument here is really not that the basis of or the way the hearing was conducted was not fundamentally fair, correct? Correct. That's not your argument? Correct. Correct. This is exclusively an issue of predetermination. Right. Right. So the fact that there's a presumption that the members of the village board made their decision in a fair and objective manner is a correct assumption? It is a correct assumption, absolutely. It is a presumption. Okay. In order to overcome that, we need to or you need clear and convincing evidence. Correct.  I don't dispute that. What is the clear and convincing evidence here that you think you can show us? We can focus on kind of expected that question. So we can focus, I think, on three specific items out of multitudes. And I'm going to ignore, for purposes of this argument, the issue of the limitation that was placed on us on discovery. We don't get to that point unless we get through the initial gateway. So let's talk about that gateway. In talking about those three examples that I want to focus on, again, we have to go from mere expressions of support, which we know aren't enough, to clear and convincing evidence of predetermination. Colloquially, I would view it as this is a good idea and we need the money, that's not enough, to this is a good idea, we need the money, and I'm going to vote for it. That, I think, are the two extremes. And in this case, I think also, and I'll get to those three examples that I just mentioned, it's more than just I'm going to vote for it, but I'm going to convince others on my board to vote for it as well. And how is that different than making a good business decision? Because this isn't just, well, it clearly can be a good business decision. The record reflects that the village of Round Lake Park desperately needed the money, that this facility will provide more money than any other project we could possibly contemplate. The difference, Your Honor, is the citing statute, 39.2, still has to control the decision. If the decision is made before the hearing takes place, regardless of how good that business decision may have been, it's still an improper decision. But the testimony of the board members was that they did not prejudge this. It clearly was. It clearly was. And if that's all that's necessary, and in reviewing my initial brief over the weekend, I probably went a little bit over the top, I have to acknowledge, because I said fairly early on, if evidence like this is going to be ignored, we might as well just abandon the concept of fundamental fairness. And that candidly was over the top. But the point is, we have to try and separate that business decision from the legal requirement. So I want to focus on those three examples, and then hopefully that will answer your question. So let's start with, we start first with the overall gloss from the senior member of the village board, Ms. Kenyon, who described Ms. McHugh, the former mayor at the time, that she had been the mayor, a new mayor was elected, and then that new mayor, Ms. Lucasen, appointed Ms. McHugh to fill an open board seat. So she was back on again. And one of the principal reasons it's in the record that she came back was to complete projects that had begun while she was mayor. So Kenyon says, McHugh worked very hard to bring the transfer station to Village of Round Lake Park in order to provide much-needed revenue. There's your business decision. Now, number one, October 13, 2009, and this is in those board meeting minutes that we relied so much on because by and large it was all we had in terms of discovery in the proceeding in front of the IPCB. So October 13, 2009, McHugh comes back from a meeting of SWALCO, the Solid Waste Agency of Lake County, and submits a report to the rest of her board. And she says, number one, landfills are filled to capacity. Well, that just wasn't true. Not only wasn't it true, even during the hearing, SWALCO's lawyer commented that not only wasn't it true, but there was more capacity than even Gruth's witness commented on. Number two, and she said that she claimed that she was just repeating what she had heard at the SWALCO meeting, which was not true. Secondly, December 13, 2011, we're now getting closer to the time that Gruth files its application. And here, by the way, in this particular set of meeting minutes, this is the connection that we talked about in the context of the discovery issue between the transfer station project and Gruth's other projects. Because this December 13, 2011 meeting, the principal focus was on the construction and demolition debris facility that Gruth was establishing. But in the context of that facility, they also talked about the transfer station that was coming. And this is what McHugh said. At that time, she was still the mayor. Mayor asked board if they wanted to take a tough ground and try and get more money. Now, this again, they're talking about the host agreement for the C&D facility, not for the transfer station. But, and take a chance on them not having a transfer station. Suddenly, the conversation flips from the C&D facility to the waste transfer station that's at issue here. And not having a transfer station, and not having a scale for the police department, or do we want to take something which is better than nothing and have them in the town and deal with the next step? And then we get to, very shortly before the application's filed, October 9, 2012, McHugh submits another report to the village board. This time it's regarding the host agreement involving this transfer station. And I want to digress here for a second, because there's been argument from Gruth's council in particular that entering into a host agreement doesn't reflect predetermination. I couldn't agree more. Our point here has nothing to do with the fact that they're discussing the host agreement. It's what they're discussing in the context of the discussions about the host agreement. So, what do they say? After meeting with Gruth's attorney, they stated that in order to get things done in a timely fashion and make this, and the this is this transfer station, make this a reality by next operating season, which would have been 2013, they did, and there's a word missing here, I synced it, I S-I-C-ed it, the missing word is need. They did need to get approval of the host agreement. Board discussed what had been explained so far, and they don't want to push too far and end up losing everything. So, you're saying that the mayor or the board was saying that doing this host agreement was a conditioned precedent to getting the... Oh, well, it always is. So, is that improper? Absolutely not, and that was my point. Entering into a host agreement in and of itself is absolutely not improper. The context here that I'm talking about, however, is make this a reality by next operating season. The this is the transfer station. So, at this time, what we're hearing between these three sets of meeting minutes is that McHugh at least, at the very least, McHugh is saying we want this to be a reality by next operating season. If you're getting to the operating season, you've gotten through the permitting process, because operating means not only have they gotten their siting approval, but they've gotten their development and operating permits from IEPA, because that's how, obviously, they're going to be operating. How do you get to, what evidence do you have that there was anything untoward that went on behind those comments? I mean, other than just in her role as mayor, a position of leadership, looking forward, planning for her community, what evidence do you have that she or anyone else met with Groot, that there was some sinister activity going on that had this as a, quote, done deal ahead of time? What is there in the record? Meetings with Groot occurred all the way from 2009 forward. That's in the record. Yes, but not just meetings, but meetings for the purpose of allowing the board members and the mayor to prejudge the application. Well, again, there's clearly evidence in the record, and the AG's office acknowledged that there were pre-application contacts involving the transfer station. But that's not enough. We all know that. Absolutely, that's not enough. Because we were precluded from taking any further discovery on the issue, all we really have is these meeting minutes. How is that enough, counsel? Well, again, if we just look at these and see, as of a few months before the application is filed, that they are already looking at making this, and this is specifically Mayor McHugh, looking at making this a reality by next operating season. In her mind, at least, they're already past the siting process. They're looking at the trash talking. They're looking at the trash flowing through this facility, the income coming into the village from this facility. And, again, if we forget about 39.2, the notion of a public official doing, particularly in these economic times, doing anything and everything to bring much-needed revenue into a community is laudable. There's absolutely no complaint about it whatsoever. The problem becomes in this context, you cannot separate that decision from the requirement that before you get to start getting the cash, you first have to go through 39.2 and confirm that they've met all nine criteria. And that's what's missing here. We go from the economic decision to getting to the operating season without 39.2 in between. Well, what other criteria do you feel that they didn't meet? I mean, you're saying that there was collusion and they colluded with them. What other criteria do you feel that they did not meet? There are several. And I'm running short, so I'll go through this as quickly as I can. Let's start. The big one, really, from our perspective, the most clear-cut one, or I should say in terms of manifest way to the evidence, the one where the opposite result is clearly evident, plain, or indisputable is criteria number one, the issue of need. So I'll summarize it very briefly. There are two existing landfills in Lake County. The evidence is undisputed. Not only was it from our expert witness who has 40 years of experience. I see you're trying to stop me there, so I'll stop for a second. Well, in looking at each of the criteria that Justice Shasta asked you about, and certainly in reading your briefs, aren't you really asking us to re-weigh the evidence and decide in favor of your experts? No. Okay, explain why not and how not. Am I asking you to re- Well, I mean, the Pollution Control Board used manifest way to the evidence. Clearly, and that's And we're to use manifest way to the evidence. Yes. But I think, are you not also asking us to make credibility determinations as to the witnesses that were produced? No, no. Specifically, if I interrupted, I do apologize. No, no, go ahead. Specifically with respect to Criterion 1 and 8, I'm actually not, because the evidence is undisputed. There is no issue with credibility. So let's look at Number 1 first, need. The evidence is undisputed that there is adequate landfill capacity in Lake County through 2027. That's Number 1. That's undisputed. That's even in Groot's own application. So your dispute with Criterion Number 1 is timing. No, no. Well, Groot tried to turn it into an issue of timing, but it's not. It's an issue of the legal standard. The legal standard to establish need, it's in the, most recently in the Fox Marine case that Justice Zinoff is so familiar with, is, and I'll read it. The applicant must demonstrate an urgent need for the new facility as well as the reasonable convenience of establishing it. And in order to establish that urgent need, you need to look at that the facility is required by the waste needs of the area, including consideration of its waste production and disposal capabilities. That's the standard. It's not an issue of timing. And their own witness, Christine Sieber, Groot's own witness, acknowledged that urgent means immediate. It means now. More specifically, it means as of 2015. That's in the record. How about City of Brockford versus Winnebago, where it doesn't have to be an absolute necessity, does it? There's a difference, I think, in my mind and in the case law, Your Honor, between absolute and urgent. Go ahead. What is the distinction between the two? But clearly the case law, and it's not just Fox Marine, it goes back quite a ways, the case law requires urgent, which Groot's expert witness, she interpreted urgent as immediate. It has to be now. Is there a need now? So that's still not an issue of timing. I'll get to timing in just a second. So we get to what is the need today in terms of, in consideration of waste production and disposal capabilities. Completely undisputed. Not an issue of credibility. Completely undisputed that there is adequate capacity in Lake County through 2027. So we're not asking you to reweigh anything. As I said, Siebert equates urgent with immediate or imminent. By immediate, she meant as of 2015. And I should add, the Pollution Control Board acknowledged this in their ruling, what we're asking you to review, that those are in fact the facts. 2027. 2027. So if that had been 2017 instead of 2027, would that be an urgent need? It's a much closer question because that's when you get to timing. Because here's the point. I'm very glad you asked that, Justice Spence. Because one of the arguments that was raised, and I'm going to get to how Groot tried to avoid the undisputed fact that there is, as of today, 12 years of capacity remaining. There was an issue that came up regarding how long it takes to develop one of these. That's where timing came up. And Siebert claimed, in contradiction to prior testimony and other proceedings, that it takes four to seven years. What she missed, what they haven't addressed in any of the briefs, is if you look at the application they filed, it actually only took them roughly 10 or 11 months. That is, in fact, the evidence in this case. So two years is clearly a closer question, Justice Spence. Twelve years is not. Because we have direct evidence in this case from our expert, Mr. Thorson, who has 40 years of experience in Lake County waste issues, that if you take the real time. And I should add that issue of when they actually developed this application. And let's step back again a second. We're not talking about a landfill here, which is a massive engineering project. You're talking about a box with two holes in it. Truck goes in one side, comes out the other. You're not talking about a complicated engineering exercise. Other than the fact, for purposes of Criterion 2, that they're refusing to put in the older scrubbers, which our expert says, and the US EPA say are necessary. But getting back to this, timing, allow for mistakes, maybe two years. So if landfill capacity was going to be exhausted in 2017, I'll grant you that one. But not 10 years after that. And what Mr. Thorson testified was, if you take into account, with some fudge factor, the real amount of time that it takes to develop one of these things. And if, let's assume two years, then you don't need one of these things. There is no urgent need in Lake County for a transfer station. Assuming neither of these landfills are in fact expanded, which is also part of the solid waste, the solid waste plant, which also calls for the possibility of expansions. Assume that never happens. You don't need a transfer station in Lake County until 2025. We're going to give you your time and rebuttal. Your time is up now. Thank you very much. Okay, thank you. Mr. Porter. May it please the Court. Again, I'm Rick Porter on behalf of Group Industries Incorporated. And when I hear Town & Country's argument, I'm reminded of the scene in Blues Brothers where Elder Blues mentions that he just had a wish sandwich, which is one where you have two pieces of bread and wish you had some meat. It's exactly what is going on with Town & Country's home. There simply is no meat to any of their claims. Their fundamental fairness claim starts with a claim that Well, do you want to start with the need issue that counsel just addressed? Maybe let's go backwards for a minute if you don't mind. Certainly. On need, as you pointed out, Justice Enoff, they clearly are looking to re-weigh the evidence. There were two experts that testified in regard to need. Our client's expert, Zebert, testified that she had done the only needs analysis that was actually done in the case, and their expert admitted that he had not done any needs analysis whatsoever. But did they both agree that it's 2027? Actually, no. What was testified to was that there's an immediate need for transfer station capacity. As a matter of fact, the transfer station at issue only accepts 750 tons of waste per day, but the service that is presently used is 3,422 tons per day and up to 4,191 tons by 2035. So what the testimony was, was the landfill capacity commitment of the two landfills in Lake County actually expired or is expiring by 2017. Those two landfills only committed to take Lake County waste through 2017. And so there's a cell waste management plan that requires one to have capacity available as it expires. It has taken seven years, and this is the testimony at the hearing was, it took seven years to get this transfer station to the point we are now, and it's still not up and built. Not two years. There was a testimony to that. That's, I don't know where Mr. Blaze is grabbing that now from the record, but the testimony was it took seven years. It also was that it takes at least nine years is the average to site a landfill. Therefore, what the testimony was is they're actually well behind schedule. They're going to need five or so more transfer stations in Lake County because landfills are getting built further and further away from Chicago, and the trend is more toward transfer stations. So there was a testimony of immediate need. And matter of fact, there was no transfer capacity right now in Lake County, and that was the testimony that was presented to the hearing officer and the village board and reviewed by the PCB. That decision can only be overturned if it was against the manifest way to the evidence. Not only is it not against the manifest way to the evidence. I directly asked Mr. Blazer's expert as to whether or not he had an opinion on the need ultimately, and he admitted, no, I don't have an opinion on need. And I said, okay, so your question is about timing. What timing do you believe should be utilized? When should an application be filed? And he said, well, that's beyond my wheelhouse, was his exact words. In other words, he testified it was beyond his expertise to determine when the application should be filed. Well, we presented a very thorough and complete needs analysis with a well-qualified expert that there is a need for a facility now. That was accepted by the village. It was affirmed by the PCB, and it simply is not against the manifest way to the evidence. Matter of fact, it was unrebutted testimony. As to the fundamental fairness claim, I just want to remind first the panel that the petitioner has the burden of proof, and it's a very high burden. They must show that the proceeding was fundamentally unfair and that the determination of fundamental fairness was clearly erroneous. It's a largely deferential standard to the PCB. It will only find the finding clearly erroneous when the court, after reviewing the records, left with a definite and firm conviction that a mistake has been committed. Well, there's been no evidence of a mistake being committed. When Mr. Blaser just told us, when asked by the court of where is your evidence of clear and convincing specific evidence that the members of the citing authority were actually biased, the first time that we ever heard anything about McHugh's statements about a SWALCO meeting was in the reply brief, never even been brought up in the original brief, and in oral argument here today, as well as this reality of next operating season. That was the first time we ever heard about it was in the reply brief. So counsel's been speculating and guessing and changing his theories as to lack of fundamental fairness throughout the PCB hearings and up to today, and those arguments have been raised and were not raised at the underlying hearing. Well, but now, when you say they weren't raised, you argued certainly they were forfeited, but how were they not raised before the hearing officer at the time that the village cross-examined Mr. Thorson? I mean, that's when they were raised, during that question. Well, correct, but those aren't ultimately the theories. What was raised at the village was Mr. Session was cross-examining Mr. Thorson and made a statement, would your opinion change if this was ultimately approved? Somehow that got morphed by SWALCO's attorneys saying, well, I didn't know you were a co-applicant, and that gets then latched onto by Mr. Blaser and argued at this late date that somehow they're a co-applicant. But then when he was challenged by Your Honor as to what are the specific evidence of bias, that one never even came up. What he discussed was, first, that Ms. McHugh had come back when she was mayor and reported on a meeting that she went to SWALCO, which wasn't even about this transfer station. And he's quoted it here, and it says one issue is that landfills are filled to capacity. That's what she was reporting was reported at the SWALCO meeting. Which wasn't true, correct? Well, he says it's not true. That's not in the record anywhere. All that we have a record of of what was said at the SWALCO meeting is what Ms. McHugh said. And regardless, that's nothing to do with Brooke's transfer station application. She's just reporting in her duties as mayor as to a meeting that she attended. And she did go on to say that Brooke is looking into transfer stations. That was reported at the SWALCO meeting. That's the only reason this even is before you, is because the word transfer station was in this meeting minute. And that's the only reason that it's even in discovery, is because we produced every meeting minute that had the word transfer station in it because that is where the hearing officer drew the line as to what discovery would be. So this actually had nothing to do with any particular application of Brooke in front of the village. This was just reporting on a SWALCO meeting. And certainly is not evidence in any way of specific evidence of bias on behalf of Ms. McHugh. And regardless, it wasn't at all about the cross-examination of Thorson or being a co-applicant. It had nothing to do with that. So then that brings us to the one statement that he honed in on in the original briefs, which is Mary McHugh asked the board if they wanted to take a tough ground and try to get more money and take a chance on them not having a transfer station and not having a scale for a police department, et cetera. That, again, is actually in relation to a host agreement negotiation for a C&D transfer station facility. So I've got two problems with it. One, the law is actually clear that discussions about host agreement and revenue are not topics that are adjudicated facts in a criterion 39.2 hearing. So they can't be evidence of bias. Revenue is not one of the eight criteria. That's what the MEGAFAB case says. And so if you were to get in and say, I think there's always a need for a landfill and I don't care what record has to say, then you've said something about one of the known criteria, Criterion 1. But none of those criteria relate to revenue, which is where MEGAFAB and Fox Marine and all those cases have talked about. That's not an adjudicated fact. So the statements that you make about revenue and host agreements and fees cannot be evidence of bias. That's what the law is. Do you have, was there a testimony of some candidates, I think they were running for trustee, using this as a platform for their election? What you're talking about is the Fox Marine case, not our facts. In Fox Marine, there were candidates that literally campaigned on an anti-landfill platform. Correct. In this case, wasn't there a couple of trustees who were mentioning it? No. When there were none? No. Okay. That's not in the evidence before this panel. But to your point, though, in Fox Marine, not only did they make those statements, it was still found to be proper and that they were allowed to vote and their votes were not thrown out because mere statements of a position before an application is filed are allowed. As a matter of fact, the statute itself discusses the fact that a host agreement can be negotiated before an application is filed. In this case, may I conclude? Yes. In this case, there is no evidence of any post-filing communications between the decision-maker and the applicant. There was a very clean process at issue in this case. So counsel is left with trying to look at pre-filing contacts and trying to speculate as to somehow there being pre-application, pre-adjudication of the merits. There simply is no evidence of that to support his speculation surmise. For those reasons, the PCB decision should be affirmed. Thank you. Thank you. Thank you. Good morning. I may have pleased the court. Assistant Attorney General Ann Mascaleras for the Illinois Pollution Control Board. Counsel, good morning. I have a question right away. Sure. Regarding the standard of review. Okay. On each of the criteria in your brief, you seem to argue that since there is some evidence to support the testimony of groups' witnesses, that the PCB's findings were not against the manifest weight of the evidence. What is your authority for saying that some evidence, the word some, is enough? Isn't the standard that the finding cannot be against the manifest weight of the evidence? And is that not against what we should be measuring the evidence? That's correct, pursuant to the town and country decision. Correct. So what's the difference between some evidence and manifest weight of the evidence? Because, as I said, your brief talks about, well, there was some evidence, so therefore it wasn't against the manifest weight of the evidence. Can you expand on that a little bit? I just think to the extent that we recognize that it is a manifest weight of the evidence standard and that it was a double manifest weight of the evidence standard, meaning the PCB reviewed the local citing authority's decision for manifest weight, and then this court reviews the PCB's decision. So to the extent that the PCB, in our brief, we pointed out that there was evidence, if I use some evidence, the term some evidence, I was meaning that it met the manifest weight of the evidence standard because there was evidence supporting those points on the criteria adduced before the local citing authority that the local citing authority properly relied upon when the PCB reviewed the criteria on those points. So any evidence is enough to meet the manifest weight standard? Well, it would still have to meet. I mean, it's just the manifest weight standard and how courts have interpreted that. And I know courts have taken, described that, appellate courts have described that in different ways, but I think that in this case, all of the evidence taken together and presented in fact on each criterion met the manifest weight of the evidence standard. Okay. Thank you. I'm happy to take other questions. Otherwise, I would just like to address the discovery order that the Pollution Control Board and the hearing officers entered. Counsel for TCH seemed to contend that TCH was precluded from discovering things untoward between the village representatives and group due to the PCB discovery orders, but the PCB did not abuse its discretion in entering the discovery orders. The PCB rule provides for a relevancy requirement in discovery. The purpose of discovery is to uncover all relevant information and information calculated to lead to relevant information. TCH had issued interrogatories and requests to produce to group the village and the village board seeking information regarding all contacts and communications, not just regarding the transfer station, between group and village representatives. From March 2008 through the time of the filing of the application, the hearing officer entered a discovery order stating that the time frame for all discovery requests is the date from when Klozinski was hired in June 2013 to the date that siting was approved by the local siting authority, and the subject matter would only be regarding the transfer station and not other facilities. Well, why isn't what went back to 2008 and all of that activity relevant then? The PCB was unconvinced that prior activities and prior siting proceedings were relevant here, although it did order that within the discovery that was turned over that TCH could make further discovery requests if they could produce the relevancy requirement, if they could meet the relevancy requirement. But TCH's requests were boundless. They were unlimited by time or subject matter and pointed to nothing. They were on a fishing expedition, and the board reined that in. They never made a narrow discovery request stating that they were looking for a particular thing relevant to the fundamental fairness issue raised before the PCB. One point that they made in the brief was that regarding McHugh's comments during the December 2011 village board meeting regarding the host agreement for the recycling facility and not wanting to lose the transfer station, but that doesn't show that information concerning prior siting proceedings for other facilities is relevant to the fairness of the siting proceeding for this transfer station and whether the village board prejudged this application. Well, why weren't they prejudiced? How were they to find out this information if it wouldn't be through discovery? And isn't the gist of their argument collusion and meetings that took place and relationships that developed at an earlier stage? Right. They weren't precluded from taking discovery. They were given discovery. They were given board meeting minutes. They were given information relative to the siting of this transfer station. But to try without pointing to specific things that happened and say, we just want all information from any discussions that anyone had, is really trying to, I think, not specifically point to something that they felt that they needed. Really, they were just out looking for something to back some theory of collusion up when they couldn't point to any theory of collusion. The PCB's point in the fundamental fairness ruling was that these were all, there was no evidence of a collusive scheme between Groot and the village. There was evidence of public and reported by the mayor and village board members of pre-filing contacts between Groot and village representatives. But none of those contacts showed prejudgment or predetermination of the adjudicative facts here. Anything further to say? I think my time has expired, so I'd ask that the board's order be affirmed. Thank you very much. Mr. Blaser. Thank you. A couple of arguments, and then I'm going to finish with a request. On the issue of need, first of all, and again, when we acknowledge that need is defined as capacity or physical space that is available to place waste. Regardless of what Mr. Porter may tell you now, this is in fact what his witness said. I asked her, I asked Ms. Siebert the question, identify the portion of the siting application that supports the existence of an immediate landfill capacity deficit in 2050. She pointed to a discussion at page 1-19 of the siting application. In the record, it's page C00038. This question and answer followed. Question. So it's your position that as of 2015, there will not be sufficient capacity in the two Lake County landfills to accept Lake County waste? Answer. No, I did not say that at all. That's how we get that admission among others, because it is in their application that, in fact, that there is sufficient capacity through 2027. That's why they go from waste needs, from actual capacity, to this argument they created about 20 years of need. And the point is made in our briefs. There was in the 2004 version of the Lake County Solid Waste Plan, they required a look-ahead for 20 years for waste disposal needs. That requirement was deleted in the 2009 version, which is the one that governed this proceeding. It was gone. Nevertheless, that was what was in their application. That's, in fact, what Ms. Siebert talked about. We then pointed out that it had been removed. Not only had it been removed, but SWALCO specifically said in their latest version of their Solid Waste Plan, you cannot rely on anything we said in any prior plans. You can only rely on this one, which is consistent with 39.2, which says the Solid Waste Plan that has to be looked at is the one that's in effect as of when the application is filed. So what did they do? They switched it again. Now we went from 20 years in a Solid Waste Plan, which no longer existed, to 20 years of a conceptual planning requirement in the Solid Waste Planning and Recycling Act. And where does that come from? From Mr. Porter's own closing before the village board. What Ms. Siebert explained to you is that under the Solid Waste Planning and Recycling Act, the county historically plans for 20 years' disposal capacity. Well, she didn't, in fact, explain that. She was relying on the provision in the 2004 plan that had been disposed of. And then he concluded, therefore, the evidence was clear, this transfer station would help meet the 20-year need of Lake County, except there is no 20-year need of Lake County. So in responding to Mr. Porter saying there's some dispute about how much remaining capacity there was, first of all, there isn't. It's in the record. It's 2027 in their own application. But the bottom line is they wouldn't have had to resort to this 20-year need argument if they, in fact, had evidence that there was, in Ms. Siebert's own description, an immediate landfill capacity deficit. Doesn't have to be immediate. It has to be urgent. She described it as immediate. I acknowledge that Justice Spence, it's probably a function of how long it will take to develop a facility. Let's accept their proposition, which is not supported by the evidence. Let's say it's four to seven years. Let's split the difference and call it five and a half years. That means there's no need for a transfer station in Lake County, under the best of circumstances or the worst, depending on your perspective, until sometime in 2021. But the PCB had all of this evidence before them. Correct. And that gets to my request, Justice Zinoff, because you asked Ms. Mescaleras about some evidence versus manifest weight. Some evidence, as we all know, historically is described as mere scintilla in the case law. That's not manifest weight. And the problem is, and you can see it from town and country forward, up until town and country, and I think there's some confusion there because Mr. Porter was referring to Timber Creek as town and country because town and country is such a huge case in this context because it really guides you in what the standard of review is and what you are in fact supposed to review. But what we see in the case law before town and country is a somewhat more activist pollution control board. They seem to look more closely at what's going on at the underlying decision. What you see since town and country, it was commented on in Fox Marine, where I think it was Justice Baldwin who led on that opinion. And he commented on the fact that the PCB spent far more time describing the various claims of the parties than they did in actually analyzing the issues. And you need look no further than the opinion in this case. You have a 73-page opinion from the pollution control board. Seventy pages of that is the he said, she said. Three pages of it is analysis. And that three pages, after having gone through all of the positions and acknowledging everything I've told you, for example, I mean that the evidence is 2027. That on Criterion 8, the solid waste plan does not allow them to, as part of their operating plan, to send all their waste to a landfill that hasn't entered into an agreement with Lake County. They've done all that. And then in that final three pages on 73, they ignored it. My time is up. If there are no other questions, I think you know what my request is. Thank you very much. Thank you. Thank you, folks, for your argument on this matter. This case will be taken under consideration and the decision will be rendered in due course. The court will be in the recess.